The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw an eye and give their attention. For the Court is now sitting. God save the United States and this Honorable Court. Good morning. Please be seated. Welcome to the May session of the Fourth Circuit. Judge Wynn and I, of course, are absolutely delighted to have our dear friend, Judge James Spencer, sharing the bench with us this morning in this first case. We'll proceed then to our first case. Santos v. Frederick County Board of Commissioners. Counsel will hear you whenever you're ready. Good morning, Your Honor. John Hayes on behalf of the appellant, Roxanna Santos. If Your Honor, please, I'd like to briefly review some of the facts in this case in order to set some context for the issues that are before this court. On the morning of October 7th, 2008, at about 10 a.m., Ms. Santos was sitting on a curb near the parking lot behind the place that she worked, an entity called the Common Market, which is a grocery store, essentially. She was sitting on the curb, facing away from the Common Market, and next to her was a storage container or storage pod. At about that time, a patrol vehicle from the Frederick County Sheriff's Office came around the corner of the building. Counsel, I think the drama of the facts is nice, and I understand the context of it, but we've already read these facts. Just assume, I mean, you can go ahead and continue in this fashion, but let's go to the issues, because you only have a very limited time, so I'm trying to move along. Otherwise, we're going to end up talking about these facts, and the issues are really what we're interested in here. I understand, Your Honor. I will just spend one more minute on it with the court's indulgence. The only disputed fact with respect to the encounter between the police and Ms. Santos is whether she moved once the patrol car came around the corner. She testified she did not. A third-party witness testified that she was essentially in the same position at the moment that the patrol car came around the corner and at the time the officers encountered her. The officers, on the other hand, testified that when they came around the corner of the building, her eyes became wide and she picked up her belongings and moved. That doesn't strike me as particularly material. If you don't contend, do you, or perhaps you do, do you contend that she was seized before they ran the warrant check? We do, Your Honor. When was she seized, according to your submission? We have two positions with respect to that, Your Honor. Give me the best one first. Well, the best one is that she was seized when the questioning continued for an extended period of time. That's a little too fuzzy for me. I understand a seizure can be a process, but it would be helpful if you could identify a moment in time, the earliest at which you contend she was seized. Well, if Your Honor, please, we would contend that would be the point at which, after asking her some preliminary questions, such as did she work at the common market and asking her for identification, the officers stepped away from her some distance and conferred with one another. We would contend at that point that she was seized. Let me try to put this at least in a context. The district court pointed out three different events. One of when, of course, your client, Sanchez, is when she was approached by these officers coming from different directions. The second one being when, after they had been in position for a while, and then the officers make an actual arrest, and they say that's when she was handcuffed. That's what they say. Well, the district court says no, none of that happened at that point. It happened when she asked to leave, and they put her, they said you got to remain. The district court says that's when the seizure occurred. So that's the district court's perspective. Your perspective is that it happened when they approached, and you're mentioning these other events, but why wouldn't a seizure, at least your argument, the best one it would seem to me would be when these officers come from two different directions and essentially is not able to go, because the whole issue is when is she free to leave? And at that point, when you're looking at an objective, reasonable test, they're coming from two different directions at her, two officers standing over her at that point in the light most favorable to her, all of that business about whether she's ducked or not, the district court says we're looking at a light most favorable to her. She remains seated. So why is that not your best argument? Well, Judge Wynn, it may very well be. As I said in answer to Judge Davis' question, we have two positions with respect to seizure. The first is as soon as they came around the corner from opposite directions of that pod and, as they say, peeked around the corner to continue their investigation and then surrounded her, that she was seized at that moment. That is our first position with respect to that. So I agree with the court that our position is seizure occurred at that moment because she was not free to leave. Well, I'm not saying it occurred. I'm saying your argument, it seems to me, when you're looking at the factors that constitute a seizure and you try to satisfy the Mendenhall basis that it's a free to leave objective status, that seems like to me it's a very powerful statement from your perspective, more so than when they start questioning her. As Judge Davis says, that gets a little fuzzy because you have a right to question. I mean, to ask for ID and do things like that. There's no question you have that right, Your Honor, obviously. But as we've said in the brief, as we argued to the district court, the seizure occurred at that moment when they came around the corner of that storage container of that pod, surrounded her and conveyed to her that she could not leave. I mean, objectively speaking, she was surrounded by two officers at that point. They didn't convey to her she couldn't leave at that point. They just started talking to her. They didn't say you couldn't leave. They did not say it definitively. I agree with the court. But they did question her at that stage. And later, as she got asked if she could get up, they gestured no, no, no. And it's at that point that the district court has determined that a seizure took place. Our position is it occurred sooner than that. Do you lose the Fourth Amendment claim if we conclude that the seizure at that point identified by the district court was indeed the first moment of seizure? No, Your Honor. I don't think we do. And so how do you avoid an affirmance? Well, at that point, that really connects to our other argument with regard to whether or not these deputies had authority to enforce civil immigration laws. At that point in time, the deputy has testified, Deputy Openshaw, that... Of course, that's a different issue. I mean, you're talking about whether or not they had the probable cause to arrest. That's correct. Which is a whole different issue than what Judge Davis is talking about. He is saying with regard to the seizure is the articulable suspicion that the district court relied upon, which was that they already had the warrant, they already had notice of the warrant, and there's nothing to controvert that evidence. So that's undisputed, at least on the record from the perspective of officers. They said, we already knew that there was a warrant for her when we told her she couldn't leave. And so his question is, do you lose on that issue if we accept the fact that seizure occurred at that point as opposed to when you said that when they approached her? Well, if Your Honor please, obviously we contend it occurred earlier than the point that the trial court found it occurred. Furthermore, our position is that because the deputies don't have the legal authority to enforce the civil immigration warrant, they do not have a basis upon which to seize her. There is no probable cause based on that civil immigration warrant. So at that point in time... But if Your Honor please, it has to be articulable suspicion of a crime. Do you contend that they knew it was a civil warrant? We do, Your Honor. And what's the proof in the record that they knew when they got the hit? Well, first of all, Deputy Openshaw has testified that it was an active ICE warrant for immediate deportation. And warrants for deportation by definition... We're going back to the moment when they got notice on the dispatch. What is the evidence of the deputy's knowledge at that time? It is the deputy's own testimony. Deputy Openshaw testified that what the transmission he got from dispatch was that it was an active ICE warrant for immediate deportation. That's his testimony. The warrant's not in the record. The warrant's never been produced. Your contention is that when he was told it was for deportation, at that point these deputies should have walked away. That's your submission. Well, if Your Honor please, that's one of the things they should have done. What else should they have done other than walk away? If Your Honor please, if they believe they have... They can follow up with ICE to determine whether or not there are any criminal issues involved with this confrontation with her. I think you just psyched yourself. Your submission is that if they're told the warrant is for deportation, they have to walk away, except, if I understood your last response, they can continue to detain her for the purpose of following up with ICE to see if there's a criminal element, that's not your word, but there's a criminal aspect to the deportation order? I didn't... No, Your Honor, I apologize. But I misunderstood. That's not what I intended to say. Okay. They should, once they know it's civil, walk away. If they want to follow up with ICE, not detain her and follow up, but follow up with ICE, obviously they have a right to do that. But they do not have a right to arrest her, as they did in this case, based on that civil immigration warrant. Okay. So in the remainder of your time, if you could, some of it, how do you respond to the qualified immunity issue? Well, if Your Honor, please, the qualified immunity issue, I would submit, doesn't apply because this is a declaratory judgment action. We're not seeking... That would be applicable in the event where there was a money damage claim, but this is what is sought as declaratory judgment. So the qualified immunity... Why wouldn't that be an advisory opinion by this court if we were to agree with you that these deputies, that we declare that these deputies under these facts didn't have the right to detain her? You want a declaratory judgment only to that effect? Well, what I'm saying... I thought this was a claim for damages. Well, and declaratory judgment. So what I'm saying, if Your Honor, please, is that the trial court ignored the fact that there was a declaratory judgment claim in addition to the money damage claim when it granted the summary judgment motion, at least in part, on the qualified immunity argument. Wouldn't it have been as much an advisory opinion if the district court had done it as it would be if we do it? Sorry, Your Honor. I didn't follow the question. You say that qualified immunity is out of the case today on appeal because you're seeking... You sought and you're still seeking a declaratory judgment that these two deputy sheriffs from Frederick County on this occasion didn't have the authority to detain an individual on the basis of an ICE deportation warrant. We're saying, if Your Honor, please, that the trial court was in error when it dismissed or granted the summary judgment motion based, at least in part, on the deputy's argument that they were entitled to qualified immunity because in doing so, the district court overlooked the fact that there was a declaratory judgment claim being advanced by Ms. Santos below. And how does that help you here on appeal? Well, if the court were to agree with us that that was error, that that cannot be the basis for granting the motion and dismissing the case, then it should respectfully submit remand and reverse remand. But not on damages because you just said it's limited to declaratory judgment. Pardon me? Not for damages. Not for damages, Your Honor. Not for damages. That's the point. Not for damages. So your submission today, if I understand, is that if we agree with everything the district court did, we still can't affirm the judgment. We would need to vacate in part, I suppose, and remand to the district court for consideration of your declaratory judgment claim. Yes, Your Honor. Did you abandon your equal protection argument? No, Your Honor, we did not. You didn't brief it. Not one word in there about it. Except in the beginning of it, you just bring it up and then never see it in your brief at all. Pardon me, Your Honor. I was thinking in terms of the civil immigration issue, which there's been some question raised about. Whereas equal protection does not leak from your brief at all. I agree with that, Your Honor. I agree with that, Your Honor. Why did you abandon that argument? Well, it was a decision made by the group that we're representing, Ms. Santos, Your Honor. That's because you accepted the district court's determination that the Sixth Circuit case is not the case in the law in the Fourth Circuit, because there's never been a case like that? Well, that would certainly be part of the discussion, Your Honor. All right. I see I'm out of time. I suppose it will remain that way. Thank you, Your Honor. Thank you. You have some time reserved, Mr. Hayes. Good morning. May it please the Court. I'm Sandra Lee, representing Deputies Jeffrey Openshaw and Kevin Lynch of the Frederick County Sheriff's Department. Your Honor, the district court correctly granted summary judgment in favor of the defendants, appellees, deputies, in this case. The plaintiff's claims in the district court were brought under 42 U.S.C. section 1983. The plaintiff claimed the deputies violated the Fourth Amendment by seizing her, as my estimable counsel, Mr. Hayes, outlined. Your Honor, the district court's finding of fact that Ms. Santos was not boxed in was not threatened. I don't think the district court made any findings of fact in ruling on a motion for summary judgment. The district court reviewed the evidence and found it undisputed that Ms. Santos was not touched and did make a finding in its order granting summary judgment that the approach I'm addressing Judge Wynn's inquiry into the approach by the two deputies. Ms. Santos was in a, as opposing counsel mentioned, was in a large open area by a big parking lot on one side and a big open field on the other side. She testified and the deputies also The district court, in its order, laid out nicely the contentions of both the parties here. And it says that Ms. Santos says that she was seized as soon as the deputies approached. But the officers say that she was seized when she was actually handcuffed. And then the district court says in this respect, both sides asked too much. Yes, Your Honor. But in describing Santos's version, which is when you're doing summary judgment, he lays out the fact. That the fact that she was approached by not one, but two officers who circled the storage container in order to approach her from opposite directions who stood while she remained seated. The business of her ducking and stuff in a light most favorable is not what the district court considered. It looked at it in a light most favorable sense. She sat right there and she was just eating her sandwich. She's out in the middle of, I guess, behind the storage bin. And these two officers stopped their car and come from opposite sides. Now, why did it come from opposite sides? I don't know. They said, well, because they want it for safety reasons or whatever. I don't know what the danger was. The lady sitting down eating a sandwich. But they did. They came from opposite sides. They approached her, stood up over her, and he accepts this. This is what they're saying. There's nobody else nearby when this occurs. That's his statement right here. And they say limited her possible avenues of departure. And didn't ask her whether she'd mind asking some questions. Didn't ask if she wanted to do that. Didn't tell her she could leave. And repeatedly asked for identification. That's in a light most favorable. And that's what the district court said was not a seizure. Now, how it got to this other point of saying she was seized within the meaning of the Fourth Amendment when she asked if she could get up and the deputy says she had to remain seated, there's nothing other than just he says that. Which I'm not saying is not supported, but he just says it. He just says, well, the court must reject this argument that she was seized in and the court must reject the argument he was handcuffed. She was seized when he was asked not to stand up. And that's where he took off from. Right? Your Honor, the facts were, according to Ms. Santos' testimony and the deputy's opinion. What I gave you, I'm reading what the district court said. I mean, that is what he said right here. Everything I just gave you, what you said, it's not my facts. It's not what I've pulled out. I'm reading you exactly what he said. And based on what he says, that's not a seizure. Yes, Your Honor. The district court also found that based on what the facts were that were presented to the district court in the motion for summary judgment and in the deposition testimony that was before the court, that Ms. Santos was not boxed in, in the district court's words. The deputy had testified. He says limiting her possible avenues of departure because he must view this in a light most favorable to her. It's not a finding. He doesn't get to make findings on summary judgment. So that's what he says. He says limiting her possible avenues of departure. Your Honor, the limitation of her possible avenues of departure was in one direction. Ms. Santos was, if I might use this area, the storage container was very large. It was like my pad here. And Ms. Santos, according to the testimony, was sitting by the corner. The deputies, when they pulled up in their car, according to all of the deposition testimony, pulled up approximately on the other side of the storage container. And one deputy went this way and the other around the other side. Because the storage container was not the size of this podium but was the size of a small building, the deputies were not able to see whether Ms. Santos had company such as an armed guard gang behind the storage container. There's no testimony about that. They didn't say that at all. They said nothing about we came because we thought there would be someone else or this was a tall thing. I mean, I'm looking at the way he then describes their testimony. And, of course, their version is she ducked and she ran away. She was trying to duck behind it. Well, that was when their observation. He couldn't look at it from that version. He had to look at it from the version she said right there because that's in the lightmost paper, and that's what he did. Yes, Your Honor. Their observation or their testimony, the deputy's testimony that she ducked behind the storage container was that she'd moved behind the storage container when the deputy's car turned around the corner of the market building into the parking lot. There is no testimony by anyone that Ms. Santos moved thereafter when the deputy's car pulled up, parked by the storage container, when the deputy's walked one in one direction and the other in the other direction. But for purposes of the summary judgment, it's irrelevant in terms of what the deputy's testified about the ducking because the court says it right here, she remained seated, and we're going to look at that in the lightmost favorable. I have no disagreement with that, Your Honor. I completely agree that the district court properly reviewed the facts in the lightmost favorable to the non-movement Ms. Santos. But respectfully, Your Honor, there was testimony in the record by the deputies that it was their common practice to approach an individual with whom they were going to speak for any reason from different directions so as to, well, for officer's safety. Which is another way of saying, isn't it, that it's common practice for us to seize people we want to talk to? Absolutely not. The officers testified that it is common practice to approach individuals, if there is more than one officer, from different directions. But we're talking about a situation with more than one officer. Right. Nobody in this courtroom, facing these circumstances, would stand up and walk away from these officers. Your Honor. I wouldn't. You wouldn't. But the law says it's a reasonable person test. And hypothesizes that there's such a person who, sitting there eating a sandwich, about to go to work, and seeing these officers pull up, coming from different directions, uniformed, armed officers, I don't think very many people are going to stand up. Your Honor, INSB Delgado, the Supreme Court stated, and I'm butchering their holding, of course. That's permitted in this courtroom. I thank you kindly because I'm going to do it a lot. Stated that just because an individual may remain seated and may comply with the officer's questioning and approach, and in that case, of course, it involved officers, numerous officers approaching individuals in a much more constrained area than Ms. Santos was approached. But I point out to the Court that this Court's decision in United States v. Weaver was very similar, similar circumstances in many ways, to the circumstances attending Ms. Santos. And although in that case most of the review concerned the approach by the original, by one officer in the first place, in Weaver, the officer took the individual's driver's license or identification and retained it and asked the individual to accompany him. The individual accompanied him, and it was then met by a number of other officers. When there were more than two officers present with the individual who was later detained, Mr. Weaver, this Court came nowhere near holding much less, even implying much less holding that an approach by two officers, two people. Would your argument be exactly the same if there were three officers rather than two? I haven't thought about that, Your Honor. Can you think about it now? But it kind of depends on what the, kind of, of course. No, say exactly, precisely the same facts, precisely the same facts. Would your argument be the same if there were three rather than two? And you know what the next question's going to be, right? Uh-huh. Would your argument be the same? My mother named me after Cassandra, who could see into the future correctly, so I'm hoping that she had that right. That was prescient. I'm not, I'm not prepared to draw a bright line. Of course if she were approached by a hundred, a mob of officers. No, no, don't get ahead of the Court. I'm asking about three. Well, in Weaver there were three. Okay. So would your argument be the same? Yes. Four. Your Honor, I'm going to respectfully decline to. You don't get to decline to answer questions? To, I'm going to decline to opine. That's not allowed in this courtroom. Would your argument be the same if there were four? Depends on what they did. I did exactly what the officers in this case did. Four people. Instead of one coming from each direction, two come from each direction. Yes. Ms. Santos testified that one officer stood six feet away from her and the other stood farther away by the car. That was not threatening, intimidating, harassing behavior. It was not surrounding her. It was not boxing her in. Does it take threatening, harassing, intimidating behavior to constitute a seizure? Is that the test? No, but those are certainly factors to consider, and none of the factors that this Court considered in Weaver as establishing or as relevant to establishing a seizure or that the Supreme Court stated in Mendenhall established a seizure or were relevant to a seizure, none of those factors occurred in this case until arguably the moment when Ms. Santos asked, Is there a problem? And the deputy gestured to her, which is the time that this district court held there was a seizure. I respectfully draw your attention to Ms. Santos' testimony was not, May I leave at that time, but is there a problem? Well, the deputy's position is that the request by Ms. Santos, Is there a problem? And the deputy's responding with a hand gesture from six feet away should not be held to constitute a seizure. However, the district court in so holding that it was a seizure, that that was a seizure, was being very careful. I respectfully submit that because the district court reviewing the evidence, the undisputed evidence, considered that the first opportunity at which the Fourth Amendment was implicated, the district court then reviewed what facts were in the officer's knowledge at that time, and the undisputed evidence was that at that time the officers had been told there was a warrant and they were instead of going and physically taking Ms. Santos into custody based only on that, they were confirming that ICE indeed wanted the warrant. The Immigration and Customs Enforcement officer expressly requested that these sheriff's deputies detain Ms. Santos and transport her to the custody of ICE, which is exactly what they did. They testified that they felt they had no choice. I respectfully disagree with opposing counsel that when they were told she had a warrant, they should walk away. It would be extremely bad policy for- You agree that they knew it was a civil deportation order? Absolutely not. There is no evidence in the record that it was- How do you respond to counsel's assertion that the deputy learned at the same time he learned that there was a warrant, that there was a hit in NCIC, that that hit went back to a civil deportation order? That's how I understood the answer earlier. Well, enabling the statute under which the NCIC warrant was issued- I'm talking factually now. I'm responding, if I may put- The groundwork is an NCIC warrant by statute is a federal- I'm sorry, is a criminal warrant. NCIC, the enabling statute- You're talking about the law or hypothetical. I'm asking you about the specific assertion by counsel that when this deputy learned of the existence of the warrant to NCIC, whatever the law says, that he was told that it was a civil deportation warrant, or words to that effect. Do you dispute that? Yes, there is no evidence that he was told it was a civil deportation warrant. So counsel misspoke when he says it's in the deposition? No, counsel said that the deposition testimony was that- and this is consistent with my recollection, but I am, again, going to- I'm not absolutely certain about the precise words- that there was a warrant for deportation. There was a deportation warrant. The word civil was not mentioned in the deposition testimony of any of the witnesses and does not appear on either the faxed request by ICE to detain the warrant. I'm trying to explore, and if I'm not clear, I apologize. I'm trying to explore the state of the deputy's knowledge at the moment when he learned of the existence of the warrant. Maybe that's the cleanest way for me to ask you. What was the state of the deputy's knowledge out there on the parking lot at 11 o'clock in the morning? What did he learn when he learned of the existence of the warrant? He first learned that there was a warrant. Now when you say he first learned that, can you explain what you mean by he first learned that? He was informed by dispatch that there was a warrant and that it was an ICE warrant. That it was an ICE warrant. Immigration Customs Enforcement warrant. He then requested that dispatch verify, confirm that ICE did, in fact, want this individual detained on the warrant. Okay, so your submission is that contrary to counsel's submission a few minutes ago, what he learned was that it was an ICE warrant. No indication whether it was civil or what, it was just an ICE warrant. He was not given any indication that there was a civil or criminal warrant. And to this day, the record contains no indication whether the warrant was a civil warrant or a criminal warrant. We know now it was a civil warrant. There's no dispute about that. Well, there is a NCIC warrant number and NCIC, as I was stating, is a database for criminal warrants. Which raises the question, why would a deportation warrant be an NCIC? Well, criminals are ordered deported as well, Your Honor. There are numerous grounds for deportation of an individual. I would point out that even if the individual were only to have had a civil deportation warrant, even if it had been established. Well, isn't the use of the term civil deportation redundant? Deportation is a civil matter. Deportation is a civil procedure. There are lots of people who get deported because of prior convictions. But deportation removal is by definition, as a matter of law, a civil matter. You at least agree with that proposition, do you not? To my understanding, the proceedings in immigration court are civil for deportation, yes. Even if this is a Fourth Amendment violation for arresting her on a civil warrant, you have contended that the officers were entitled to qualified immunity. Yes, Your Honor. And the opposing counsel didn't argue the business about damages at all, which seems to indicate at least there's some basis to say this law was not clearly established. But he does point out that they asked for declaratory relief, which typically you don't get qualified immunity for that. I'm having some problem understanding, as Judge Davis was articulating, what that declaratory relief is in the context of here. But how do you respond to that proposition there, that if we were to find such a violation here of the civil warrant, nonetheless, qualified immunity would protect these officers, but not to the extent that declaratory judgment is being asked for? Your Honor, I'm not going to make opposing counsel's arguments for him better than he could. No, I'm not asking for opposing. I'm asking for your response to the fact that if he is correct, and he is correct, they did ask for declaratory relief. And typically you don't get qualified immunity with declaratory relief type action. You do for damages. So damages would be out on that insofar as arrest if we went that direction. But the declaratory relief is there. What is it? I mean, what's your response to that? The response is reliance on the procedural posture of this case as it comes before you. In the first amended complaint, the plaintiff had brought an action under 1983 for violation of federal laws. The court dismissed the first amended complaint with leave to amend, stating that although it had discretion to consider a claim of violation of federal or acting under color of federal law in a 1983 claim, it requested clarity and gave the plaintiff leave to file a Bivens action if plaintiff was claiming a violation of federal laws. The plaintiff declined to plead a Bivens action, a Bivens claim, but instead filed a second amended complaint, the pleading, the operative pleading before the court at the time it granted the motion for summary judgment. So you think that's what the declaratory judgment is going to, and even if it was going to the equal protection, that it didn't bring that? Well, Your Honor, a declaratory judgment claim in this case was also brought under Section 1983, which the district court had clearly stated it was applying only to violation, alleged violations of the Constitution under color of state law, having granted the plaintiff the opportunity to contend that there was a violation of federal law by bringing a Bivens action. The plaintiff did not do so. The district court did not review any contention by plaintiffs that the deputies had acted under color of federal law, and therefore the issue was not raised, discussed, briefed, or argued, save in to the extent that the district court did look at it in denying the motion for reconsideration. And respectfully, Your Honor, I submit that plaintiffs bound in the district court, reasonably bound by her counsel's statement. Thank you. Thank you, Your Honor. Thank you very much, Ms. Lee. Thank you. Mr. Hayes, address that last point she just made about your declaratory judgment action insofar as you're seeking declaratory relief, but you've abandoned the federal law aspect from a Bivens perspective, so now you're with state laws. So what is this declaratory relief you are seeking now? If Your Honor, please, there were federal defendants initially in the case, and there was an understanding, or at least a presumption, that one of these officers might have been a 287G certified officer. Who was the? I mean, it says a declaratory judgment against defendants Arpinshaw, Lynch, Jenkins, and the Frederick County Board of Commissioners. Now, who are the federal ones? There are no federal ones. There were federal defendants originally, Your Honor. I'm only dealing with your declaratory judgment relief request, because you say qualified immunity should not be given if we find a violation of this arrest because it's a civil situation in the Arizona, U.S. v. Arizona case, and I'm trying to see what this declaratory judgment business is about. Because you're right, if it's declaratory judgment, it's outside of qualified immunity, but I don't know what it is. Well, if Your Honor, please, it is that the declaratory judgment that the arrest by these officers under this circumstance was not lawful. Okay. Does it make any difference whether or not you're asking for prospective relief regarding a historic event as to whether or not this qualified immunity would apply? Well, if Your Honor, please, I don't think it does, because if you look at the concept of qualified immunity in relation to either money damages, but let me approach it differently. There's a footnote in Arizona, for example, that talks about how Justice Breyer would rule, and it goes on to say that the qualified immunity only applies in the instance where money damages are sought. It does not apply where either the party is seeking declaratory or injunctive relief. Now, I would submit, Your Honor, the implication of the dual phrase, declaratory and injunctive relief, means conceptually it could be viewed as forward-looking or to the past events. In this particular case, what we're seeking is the declaration that this particular arrest was unlawful. And, well, I'll stop there, Your Honor, please. I hope I've answered the question. I'm reading you as having abandoned any claim insofar, even if there's a violation of the civil warrant for the Fourth Amendment arrest here, insofar as damages based on qualified immunity. Insofar as money. Because you are relying only on a declaratory judgment. So that throws out the damages completely. That's correct, Your Honor. Now, if I can go back briefly to the colloquy about the enforcement of civil immigration laws, what Deputy Openshaw testified was that he was told it was an active ICE warrant for immediate deportation. I mean, you only got just a moment. I'm with you on that. I'm saying even if we agree on that aspect of it, qualified immunity won't get you anything but declaratory relief. That's correct. So then we're locked in as what is this declaratory relief? Which is why I asked about that. If you even prevail on the initial claim dealing with the seizure being an approach, that's not the end of this matter because then it goes back to some of her judgment determination as to whether she ducked and is that sufficient for a reasonable, articulate suspicion or not. So, you know, it's far from settled. But I'm just trying to deal, I think, insofar as establishing the first part of that arrest, I'm saying so what if we do it? Even if we do it, qualified immunity kicks out damages and you're left just with the declaratory relief, and then that's when we get in this colloquy about the Bivens action that you no longer have bases the state claim that you're pursuing. Well, if I understood the court's question correctly, I agree with the analytical steps that the court has posed in that question. I think that's right. Now, fundamentally what we're saying is twofold. First, the seizure occurred at an earlier point in time and was not proper. Secondarily, that these officers did not have the authority to enforce civil immigration law and plainly the deportation order or warrant relates to a civil proceeding. So those are two fundamental points, if Your Honor, please. Now, with regard to qualified immunity, that was an argument that the deputies advanced. That goes to the second point. Well, it goes to the second point in terms of remedy, I would submit, Your Honor. It limits you to just declaratory relief. It does, Your Honor. It does, Your Honor. But doesn't it go to the first point? I'm really confused. If your client was seized at the time they approached and they didn't have reasonable articulable suspicion, there's no qualified immunity for that, is there? No, Your Honor, there is not. I'm a little confused by your response to Judge Wynn's last question. If you went on the seizure, you are entitled at least to nominal damages, aren't you? Yes, Your Honor, we are. And I want to make sure that I was only referring to the second one. As to the first proposition you bring in in terms of the seizure, yes, you would have to be shown articulable suspicion, but that's not settled because that's a disputed fact. The officer says she ducked, she did these other things, and then she says she sat. So that's more of a jury question that would remain as to the first part of it. And that's, Judge Davis, that's the way I took the question. Okay. And you wouldn't get a qualified immunity problem there because that's clearly established law. And that's the way I took the question. So if I confuse the Court, I apologize, but that's certainly the way I took it. Okay, that helps clarify. And I see that I'm over time, so unless there are further questions. Well, thank you very much. Thank you. Mr. Hayes, the matter is submitted. We'll come down and greet counsel and take a short recess before moving to our second case. This Honorable Court will take a brief recess.
judges: Andre M. Davis, Andre M. Davis, James A. Wynn Jr., James A. Wynn Jr., Albert Diaz, James R. Spenc